RESOLUCIÓN
Conforme a la autoridad que nos concede el Art. V, Secs. 3 y 4 de la Constitución del Estado Libre Asociado de Puerto Rico, L.P.R.A., Tomo 1, se solicita a la Asamblea Legislativa que, mediante legislación, se aumente a nueve el número de jueces que componen el Tribunal Supremo.
Esta petición responde a dos factores de gran peso. Pri-mero, se pretende asegurar que el Tribunal tenga los re-cursos humanos necesarios para agilizar su calendario y mantener al día el trámite de los casos que se le presentan. Segundo, se busca que el Tribunal tenga la composición adecuada para modificar su funcionamiento, de modo que pueda operar de una forma más transparente y accesible al *55 Pueblo. La celebración de un número mayor de vistas ora-les, así como la solución ágil y rápida de los recursos ante nuestra consideración, requieren un cambio en el número de integrantes de este Tribunal.
La Constitución de Puerto Rico dispone, en su Art. V, Sec. 3, que
[e]l Tribunal Supremo será el tribunal de última instancia en Puerto Rico y se compondrá de un juez presidente y cuatro jueces asociados. El número de sus jueces sólo podrá ser va-riado por ley, a solicitud del propio Tribunal Supremo. Const. E.L.A., L.P.R.A., Tomo 1, ed. 2008, pág. 412.
Lo mismo se recoge en el Art. 3.001 de la Ley Núm. 201 de 22 de agosto de 2003, conocida como la Ley de la Judi-catura de 2003 (4 L.P.R.A. sec. 24r). Estos estatutos nos reconocen la facultad de solicitar a la Asamblea Legislativa que varíe por ley la composición de los Jueces de este Tribunal. Esta disposición de la Constitución fue propuesta por este Tribunal y debatida extensamente en la Conven-ción Constituyente de Puerto Rico. Al respecto, el delegado, Sr. Ernesto Ramos Antonini, se hizo eco de la posición ins-titucional de este Tribunal sobre ese precepto constitucio-nal:
“A estos efectos, en relación con este segundo punto, deseamos informar que si la Convención considera que debe proveerse en la constitución en cuanto a una variación en el número de jueces, sería deseable que dicha variación se hiciera solamente a petición del propio tribunal.” Esas son las palabras del Tribunal Supremo, a través de su presidente. 1 Diario de Sesio-nes de la Convención Constituyente de Puerto Rico 524 (1961).(1)
*56 Finalmente, la Constitución de Puerto Rico dispuso que esa variación en la cantidad de jueces se hiciera a petición del Tribunal Supremo. Según el delegado, señor Ramos An-tonini, la Convención Constituyente acogió ese mecanismo ya que fue parte del programa aprobado por el Pueblo de Puerto Rico. Diario de Sesiones, supra, págs. 540 y 552. “[E]sa es una fórmula muy sabia, muy buena, porque tam-poco es indigna para el tribunal ....” Expresiones del dele-gado, Sr. Luis A. Ferré, id., pág. 543.
Este método permite al Tribunal ajustar sus recursos según lo requieran sus necesidades. El proceso para au-mentar el número de jueces se origina en el propio Tribunal. El delegado Ramos Antonini expresó que esa cláusula asegura que “el poder judicial no pu[eda] ser ‘em-paquetado’ en ningún momento de su historia por razones políticas, o beneficios de cualquiera otra clase, que pu[eda] poner en peligro las garantías consignadas en la propia constitución”. Diario de Sesiones, supra, pág. 552.
La experiencia demuestra la sabiduría de los padres de la Constitución. Este Tribunal no ha vacilado en recurrir al mecanismo constitucional cuando la tarea judicial ha re-querido que se aumente o se reduzca el número de jueces que lo componen. Asimismo, la Asamblea Legislativa ha mostrado invariablemente su deferencia a los pedidos de este Tribunal al amparo del Art. Ill, Sec. 3 de la Constitu-ción, L.P.R.A., Tomo 1.
Por su parte, el Art. V, Sec. 4, de la Constitución, supra, ed. 2008, pág. 412, dispone que “[e]l Tribunal Supremo fun-cionará, bajo las reglas de su propia adopción, en pleno o divido en salas compuestas por no menos de tres jueces”. Al respecto, nuestro Reglamento recoge las normas que regu-lan la toma de decisiones de este Tribunal. El término “de-cisión” incluye “cualquier sentencia, resolución, orden, pro-videncia o cualquier otra actuación del tribunal ...”. Regla 3 del Reglamento del Tribunal Supremo, 4 L.P.R.A. Ap. XXI-A. Las decisiones de este Tribunal en pleno —una de *57 las cuales es esta Resolución— se adoptan por la mayoría de los Jueces que intervienen. Regla 4(a), 4 L.RR.A. Ap. XXI-A.
La única excepción a esa regla de mayoría simple está establecida por la propia Constitución. Esta es, “[n]inguna ley se declarará inconstitucional a no ser por una mayoría del número total de los jueces de que esté compuesto el tribunal”. Constitución de Puerto Rico, Art. V, Sec. 4, L.P.R.A., Tomo 1, ed. 2008, pág. 412. Véase la Regla 4(a) de nuestro Reglamento, supra. En otras palabras, aunque al emitir nuestros dictámenes siempre nos esforzamos para obtener la conformidad del mayor número de nuestros in-tegrantes, ni siquiera al ejercer nuestra función como in-térpretes máximos de la Constitución se requiere unanimi-dad de criterio. No se requiere unanimidad, porque hacerlo conferiría un poder de veto a cada uno de los Jueces. Eso frustraría el consenso mayoritario y paralizaría el Tribunal, en perjuicio de nuestro Pueblo. “Unanimity is impossible; the rule of the minority, as a permanent arrangement, is wholly inadmissible; so that, rejecting the majority principle, anarchy or despotism in some form is all that is left.” Adams v. Ft. Madison Community School Dist., 182 N.W.2d 132, 135-136 (Iowa 1970). “Porque de-masiado se sabe que la mayoría de mitad más uno, es ma-yoría en un tribunal.” Diario de Sesiones, supra, pág. 568 (delegado señor García Méndez).
En el pasado, este Tribunal ha utilizado en tres ocasio-nes el mecanismo de resolución para solicitar la variación en su composición. El mismo año de la aprobación de la Constitución de Puerto Rico, este Tribunal solicitó el au-mento de la cantidad de sus jueces. La Ley Núm. 2 de 4 de agosto de 1952, aumentó la composición de cinco a siete jueces. Esta acción se fundamentó en el aumento poblacio-nal y de asuntos ante el Tribunal. Para entonces, la pobla-ción de Puerto Rico había aumentado aproximadamente de 900,000 a 2,500,000. Exposición de Motivos de la Ley Núm. 2 (1952 Leyes de Puerto Rico 115).
*58 Sin embargo, este aumento a siete jueces “no fu[e] sufi-ciente para impedir el desarrollo del problema de conges-tión y demora”. Comité para el Estudio y la Evaluación del Sistema Judicial, Informe al Tribunal Supremo de Puerto Rico, abril de 1965, Parte I, pág. 1.
La Ley Núm. 7 de 6 de mayo de 1961 varió nuevamente la cantidad de Jueces de este Tribunal. En aquella ocasión se aumentó de siete a nueve Jueces. Esta composición de nueve Jueces fue solicitada por este Tribunal para hacer viable la enmienda constitucional de 1960. Esta enmienda permitió al Tribunal funcionar en salas. Informe de la Co-misión de lo Jurídico Civil del Senado sobre el P. del S. 24, pág. 3. Hicimos esa solicitud debido a “la congestión exis-tente en el calendario del Tribunal”. Id.
Al así actuar, justificamos en nuestra Resolución la ne-cesidad de un Tribunal Supremo con más Jueces para atender los asuntos litigiosos ante nuestra consideración. Esta realidad ameritó el aumento de siete a nueve Jueces. Véanse, además, Exposición de Motivos de la Ley Núm. 7 (1961 Leyes de Puerto Rico 37); Diario de Sesiones de la Asamblea Legislativa, Cámara de Representantes, Pri-mera Sesión Ordinaria, 14 de febrero de 1961, Vol. 14, Núm. 1, págs. 197-198.
Con una Curia de nueve Jueces el problema de conges-tión de casos en el Tribunal Supremo se desvaneció para 1975. El 19 de febrero de 1975 emitimos una Resolución en la que notificamos la reducción de los casos pendientes a solamente 145 asuntos. Exposición de Motivos de la Ley Núm. 29 de 28 de mayo de 1975, (Parte 1) Leyes de Puerto Rico 65. En esa Resolución expresamos que “el Tribunal Supremo ha logrado reducir en tal modo su calendario que a 31 de enero de 1975 el número de casos criminales pen-dientes a su consideración montaba a 16 y el de casos civi-les a 129”. Resolución del Tribunal Supremo de 19 de fe-brero de 1975.
*59 Ante esto, solicitamos la reducción de nueve a siete Jueces. Esto es, con nueve Jueces este Tribunal redujo los casos pendientes de tal modo que ameritó la utilización de la cláusula constitucional para disminuir la cantidad de jueces a siete. En aquella ocasión entendimos que podía-mos afrontar con siete Jueces el aumento de los asuntos ante nuestra consideración y la congestión de casos. La razón para esto último fue que “el Tribunal Supremo ha[bía] descongestionado su calendario en tal forma que [era] completamente innecesario tener un Tribunal com-puesto por nueve miembros”. Informe de la Comisión de lo Jurídico Civil del Senado sobre el P. del S. 1143, pág. 1.
De la trayectoria de variaciones en la composición de este Tribunal se puede apreciar que la Constitución de Puerto Rico adoptó un mecanismo eficaz para asegurar el funcionamiento óptimo del Tribunal. En el pasado, nuestro sistema judicial se ha valido de ese mecanismo para aten-der las necesidades que surgen de tiempo en tiempo. Como vimos, ante una congestión en los casos pendientes ante esta Curia, aumentamos en 1952 y 1961 el número de Jue-ces que componen este Tribunal.
El último aumento que elevó el número de Jueces a nueve logró reducir el atascamiento de asuntos que ope-raba en detrimento de la justicia. Los datos numéricos así lo reflejan incuestionablemente. Ante ese cuadro fáctico, ya para 1975 el problema que atravesaba este Tribunal se ha-bía eliminado. Resuelto ese inconveniente, solicitamos en-tonces la reducción a siete Jueces. Precisamente, esa fue la virtud vislumbrada por nuestra Convención Constitu-yente. La Constitución nos dota de un método efectivo que nos permite ajustar nuestra composición según lo requie-ran las necesidades del Pueblo.
Sin embargo, la realidad hoy es muy distinta de aquella que nos impulsó en 1975 a solicitar la reducción a siete Jueces. Debemos dirigir nuestras acciones considerando la importancia de nuestra función como máximo foro judicial *60 de Puerto Rico. Los ciudadanos acuden a este Tribunal para defender, vindicar y reclamar sus derechos. Esta ta-rea es sin dudas una de las más importantes que ejerce el Gobierno y no podemos tomarla con ligereza. Una vez más, nos hacemos eco del planteamiento de que “una justicia tardía ... no es la justicia ideal”. In re Reforma Judicial, 136 D.P.R. 1, 54 (1994), voto particular de la Juez Asociada Señora Naveira de Rodón, al cual se unieron el Juez Pre-sidente Señor Andréu García y los Jueces Asociados Seño-res Hernández Denton, Alonso Alonso y Fuster Berlingeri. Como señaló el otrora Juez Presidente Señor Trías Monge, “[q]ueremos no sólo justicia eficaz, sino justicia pronta”. D.M. Helfeld, El seminario sobre la demora judicial: diseño, resultados y recomendaciones, 77 (Núm. 4) Rev. Jur. U.P.R. 891, 893 (2008). Por su parte, el Juez Presidente Señor Hernández Denton también ha expresado que “tj]usticia lenta no es justicia”. Id.
Por eso, es necesario hacer un recuento histórico de he-chos y estadísticas que hacen evidente la demora judicial inaceptable por la que atraviesa este Tribunal. Para co-mienzos del año fiscal 1996-97, este Tribunal Supremo contaba con siete Jueces y con 546 casos pendientes ante su consideración. Los casos pendientes son los asuntos no resueltos y que se arrastran de años anteriores. Esa cifra incluye los casos sometidos y en espera de resolución por el Tribunal, así como aquellos que están en trámites de perfeccionamiento. A su vez, los que están en trámite de perfeccionamiento incluyen los recursos y asuntos que no han sido atendidos por el pleno del Tribunal y los que están en espera de ser completados.
Durante ese año fiscal, se sumaron 722 casos nuevos, lo que dejó al Tribunal con un volumen total de 1,268 asuntos en espera de nuestro dictamen. No obstante, a pesar de que este número era el volumen total más bajo desde el 1980-1981, fue imposible atender efectivamente la conges-tión de asuntos ante nuestra consideración. De ese total de *61 asuntos ante el Tribunal se pudieron resolver 814 casos, “lo que represent[ó] un índice de congestión de 35.80% y una reducción de 3.94% ...”. A. Pérez López, Análisis estadís-tico, 67 (Núm. 4) Rev. Jur. U.P.R. 685, 687 (1998). De esos 454 casos pendientes que no pudimos atender, había 165 asuntos sometidos y 289 en trámite de perfeccionamiento. íd.
Al 30 de junio de 1974, había 629 casos pendientes ante este Foro. Nota, Análisis del trabajo del Tribunal Supremo en el término de 1974-1975, 45 (Núm. 2) Rev. Jur. U.P.R. 129, 133 (1976). Como mencionamos en nuestra Resolución de 19 de febrero de 1975, cuando solicitamos disminuir la composición del Tribunal de nueve a siete jueces, habíamos reducido la cantidad de casos pendientes a 145. Sin embargo, al 30 de junio de 1975 el número de casos pendien-tes aumentó a 369. Id. Desde entonces hemos tomado me-didas para atajar la demora judicial en nuestros tribunales. C.J. Sagardía Abreu, Consideraciones generales sobre la demora judicial en el Tribunal de Primera Instan-cia, 77 (Núm. 4) Rev. Jur. 961, 970 (2008).
Las medidas implementadas no incluyeron el aumento en la composición del Tribunal Supremo. Ya para 1996 el número de casos pendientes en este Tribunal había au-mentado a 546. Esto representó un aumento de casi un 400% de los casos pendientes en comparación con 1975. Posteriormente, esta situación empeoró con el pasar del tiempo al punto que esta cifra ascendió en el año fiscal 2008-2009 a 730 casos pendientes y a 792 para el año fiscal 2009-2010. Ese aumento fue casi un 500% del volumen de casos pendientes, en comparación con 1975, cuando so-licitamos la reducción del número de Jueces de este Tribunal.
¿Cómo llegamos a esa situación? El año fiscal 1999-2000 inició con un volumen de 487 casos pendientes. Si a ese número le sumamos los casos presentados y los re-abiertos durante ese año fiscal, resulta que este Tribunal *62 tuvo ante su consideración 1,747 asuntos. Esta cifra repre-sentó un aumento de 1.8% en relación con el año fiscal 1998-1999. Además, este número es notablemente mayor al volumen total de asuntos en espera de nuestro dictamen para el año fiscal 1996-1997. Para entonces, este Tribunal logró resolver en ese término 1,310 casos, lo que repre-senta “un índice de acumulación o congestión de 25.0%”. J.R. Rodríguez Martínez, Análisis Estadístico, 70 (Núm. 2) Rev. Jur. U.P.R. 237, 239 (2001). Al finalizar ese año fiscal, el Tribunal contaba con 437 casos pendientes, de los cuales 112 estaban sometidos y 325 en trámite de perfeccio-namiento. Id. Es menester considerar que la cantidad de casos en trámite de perfeccionamiento incluyen los asuntos que este Tribunal no había podido considerar en la etapa de expedición.
Para el año fiscal 2000-2001, este Tribunal tuvo 1,575 asuntos ante su consideración. Esta cantidad fue significa-tivamente inferior al año fiscal anterior. Sin embargo, al final del año fiscal la cantidad de casos sometidos y no resueltos por el Tribunal aumentaron a 174. Esto repre-sentó un aumento de 2.4% en el índice de acumulación o congestión, ya que esta cifra ascendió a 27.4%. J. Gleason Altieri y C.R. Pastrana Torres, Análisis Estadístico, 71 (Núm. 2) Rev. Jur. U.P.R. 205 (2002).
Este Tribunal comenzó el año fiscal 2003-2004 con un volumen total de 458 casos pendientes y durante ese año se presentaron 1,187 casos nuevos. Durante ese término el volumen total de casos ante nuestra consideración fue de 1,645. En ese año, este Tribunal resolvió 1,218 casos. Al finalizar el año fiscal se dejaron 427 asuntos pendientes, lo que representó un índice de acumulación o congestión de 26%. Aunque esa cifra fue menor al 30.8% del año anterior, una vez más se experimentó un aumento en comparación con las cifras de principios de la década del 2000. Para los datos estadísticos, véanse: L.S. Herrero Acevedo, La demora judicial en los foros de última instancia, 77 (Núm. 4) *63 Rev. Jur. U.RR. 1055,1066 — 1067 (2008); A. Rivera Torres y G. Flaqué Durán, Análisis Estadístico, 74 (Núm. 3) Rev. Jur. U.P.R. 463 (2005).
Si tomamos en consideración que en 2002 el índice de congestión era de 23% y que para el 2006 era de 32.1%, debemos concluir que hemos sido incapaces de reducir la demora judicial con un Tribunal Supremo compuesto por siete jueces. En esos cinco años, el índice de congestión osciló entre el 23% y el 32.1%. Herrero Acevedo, supra; Rivera Torres y Flaqué Durán, supra.
Peor aún, la cantidad de casos pendientes al terminar el año fiscal 2008-2009 ascendió a 730. Esta cantidad au-mentó a 792 al finalizar el año fiscal 2009-2010. Esto ocu-rrió a pesar de que durante el año fiscal 2009-2010, dis-tinto a lo ocurrido durante el año fiscal 2008-2009, el Tribunal operó todo el año con siete jueces, es decir, a plena capacidad.
En comparación con 1975, esto representa un aumento de más de cinco veces en la cantidad de casos pendientes. Esta cantidad de casos pendientes no tiene precedentes en las cifras antes reseñadas. Aunque estas cifras incluyen los casos en trámite de perfeccionamiento no podemos borrar el hecho de que muchos de esos casos se encuentran en espera de que este Tribunal decida si va a expedir un auto discrecional o no.(2)
Además, esta cantidad de casos pendientes es similar a *64 la que motivó a este Tribunal a solicitarle a la Asamblea Legislativa en el 1961, un aumento de siete a nueve jueces en el número de su composición. Así, al finalizar el año fiscal 1960-1961, el total de casos pendientes era de 830. Véanse: Comité para el Estudio y la Evaluación del Sis-tema Judicial, Informe al Tribunal Supremo de Puerto Rico, abril de 1965, Parte I, pág. 3; A. García Padilla y J.J. Álvarez González, El Tribunal Supremo de Puerto Rico: La Corte Pons, 59 (Núm. 2) Rev. Jur. U.P.R. 185, 222 esc. 110 (1990).
El número de 792 casos pendientes al 30 de junio de 2010 incluye no sólo los 155 casos sometidos para una opi-nión o sentencia. La cifra incluye también los 442 casos pendientes para que el Tribunal los considere y decida si va a expedir un auto discrecional, así como los 195 casos que están en espera de que una parte muestre causa o presente su alegato.
En la actualidad, este Foro tarda aproximadamente seis meses y medio para tan sólo decidir si expide o no un auto. Esos recursos son importantes y el Tribunal tiene que in-vertir gran parte de su tiempo todas las semanas para atenderlos. Esa tarea es tan importante que tenemos un Panel Central de oficiales jurídicos que hace un estudio inicial de todos los casos que se presentan, incluyendo aquellos que se resuelven declarándolos “no ha lugar”. Véase A. Negrón García, Práctica apelativa: aspectos cons-titucionales, legales y reglamentarios, 42 (Núm. 1) Rev. Jur. U.I.P.R. 1, 18-19 (2007). Decidir esos casos semana tras semana conlleva estudio y preparación. (3) No se pueden *65 despachar a la ligera ni subestimar su importancia para las partes o su impacto en nuestra tarea judicial. Tan im-portante para la marcha de la justicia son los casos que ya atendimos como aquellos que llevan meses esperando para que los consideremos. Vale tanto el que ya entró como el que está tocando a la puerta para que le atiendan. Los números demuestran que, definitivamente, el número de jueces disponible para atender estos asuntos incide en la demora judicial.
Esto refleja que las medidas que hemos adoptado para hacerle frente al problema de demora judicial han sido in-fructuosas hasta el presente. Ni siquiera la creación del Tribunal de Apelaciones ha podido menguar la congestión del calendario de este Tribunal. Cuando se creó el Tribunal de Circuito de Apelaciones en el año fiscal 1993-1994, el volumen de casos pendientes ante este Tribunal bajó con-siderablemente de 1123 casos pendientes al inicio del año fiscal 1992-1993 a 592 al inicio del año fiscal 1993-1994. Ello se debió a que referimos 536 casos al foro apelativo intermedio. Véase J. J. Alvarez González, Derecho constitu-cional de Puerto Rico y relaciones constitucionales con los Estados Unidos, Bogotá, Ed. Temis, 2009, pág. 82. No obs-tante, durante los años subsiguientes el volumen de casos ante este Tribunal nunca se redujo de manera consistente. Id. Por el contrario, tan reciente como en el año fiscal *66 2009-2010 la cifra de casos pendientes ante el Tribunal ascendió a 792. Esto demuestra, indubitadamente, que la creación del Tribunal de Apelaciones no resolvió el pro-blema de congestión que aqueja a este Tribunal.
Desde 1960 se considera que la congestión de casos se debe a que “el número de radicaciones excede apreciable-mente el número de casos que se resuelven anualmente”. Informe de la Comisión de lo Jurídico de la Cámara de Representantes de 2 de junio de 1960, sobre la R. Conc. de la C. 24, pág. 1. Eso no ha variado. En el año fiscal 2008-2009 se presentaron 1,367 asuntos. En ese período este Tribunal resolvió 1,257 asuntos, lo que nos deja un saldo negativo de 110 casos no resueltos, en un solo término de sesiones. Además, para el año fiscal 2008-2009 se presen-taron ante el Tribunal 1,367 casos y se resolvieron 1,257, mientras que para el año fiscal 2009-2010, se presentaron 1,368 casos y se dispuso de 1,328. Esto significa que aun-que el último año fiscal el Tribunal resolvió más casos que durante el año fiscal 2008-2009, el volumen de recursos no se pudo reducir ni tampoco neutralizar. Lamentablemente ese volumen se abultó aún más, aunque el Tribunal fue más productivo. Esto, no cabe duda, agrava el problema de casos pendientes y la demora judicial. La proyección futura con una composición de siete jueces no es favorable. Los datos citados correspondientes al año fiscal 2009-2010, que se anejan a esta Resolución, demuestran que la pro-ductividad y laboriosidad de los integrantes de este Tribunal de más reciente nombramiento no puede cuestionarse.
Cabe destacar que según el censo, en 1960 Puerto Rico tenía una población de 2,349,544 habitantes. Véase Oficina del Censo, Junta de Planificación de Puerto Rico, http:// www.censo.gobierno.pr/. En comparación, según el censo de 2000, la población de Puerto Rico ascendió a 3,808,610 personas. Id. Además, según la Oficina del Censo de Esta-dos Unidos, la población estimada de Puerto Rico en 2009 era de 3,967,179 habitantes. Véase United States Census *67 Bureau, http://www.census.gov/. Esto significa que cuando este Tribunal solicitó el aumento de siete a nueve Jueces en 1961, la población de Puerto Rico era mucho menor de la actual. El aumento poblacional desde entonces explica el crecimiento de litigios en todos los foros judiciales de Puerto Rico, incluyendo este Tribunal.
Recientemente, el Prof. David M. Helfeld dirigió un es-tudio exhaustivo sobre la demora judicial en Puerto Rico. Los hallazgos del estudio realizado por el distinguido pro-fesor y por estudiantes de la Escuela de Derecho de la Uni-versidad de Puerto Rico se recogieron en el volumen 77 del año 2008 de la Revista Jurídica de la Universidad de Puerto Rico. D.M. Helfeld, supra. En síntesis, el profesor Helfeld llegó a las siguientes conclusiones: (1) la demora judicial es un problema serio que trasciende a Puerto Rico; (2) para atajar el problema debemos tomar medidas que se ajusten a nuestra cultura jurídica; (3) el mayor problema de la demora judicial en Puerto Rico se encuentra en el Tribunal de Primera Instancia y en el Tribunal Supremo; (4) el cambio en las reglas de procedimiento civil y en las reglas internas de este Tribunal puede aminorar el pro-blema, y (5) se deben emplear todos los esfuerzos y recur-sos disponibles para atender el problema de la demora judicial. Id., págs. 912-913. En todos los artículos que ex-ponen los hallazgos del estudio, se llega a una conclusión incuestionable: el Tribunal Supremo opera con una demora judicial que imposibilita el ideal de impartir justicia.
Es necesario enfrentarnos al reto de lograr una justicia plena, pero para eso hay que aceptar “la realidad de que urna parte significativa del problema judicial puede encon-trarse en [este] foro”. Helfeld, supra, pág. 900. Las estadís-ticas reflejan que el Tribunal Supremo federal, que opera con nueve Jueces, resuelve alrededor de 96% de los casos el mismo año que los recibe, mientras este Tribunal, inte-grado por siete Jueces resuelve solamente el 76% en *68 promedio. íd.(4) Precisamente, el impacto de la demora judicial y de la congestión de asuntos está en esos casos que nos vemos imposibilitados de atender año tras año. Id. Las diferencias en funciones entre el Tribunal Supremo federal y nosotros no justifican “la superioridad en la eficiencia del Tribunal Supremo de los Estados Unidos”. íd. “[E]s esen-cial entender que no habrá solución hasta que [este Tribunal] reconozca su responsabilidad por su aportación al problema”. Id., pág. 901.
Sin duda, el retraso de este Tribunal en la tramitación de los casos tiene un efecto directo en los foros inferiores. Muchos de los casos que atienden los foros de menor jerar-quía se paralizan en espera de que este Tribunal resuelva un asunto y devuelva el resto de la controversia. “La dila-ción en la emisión de una decisión judicial es, pues, contra-ria al concepto mismo de justicia.” F. Hernández Denton, La Administración eficiente de la justicia, 77 (Núm. 4) Rev. Jur. U.P.R. 915, 917 (2008). Véase, además, Álvarez González, op. cit, pág. 81. Como bien apunta el profesor Alvarez González:
El efecto de la congestión trasciende las estadísticas. Un tribunal congestionado es, por naturaleza, menos propenso a dar la atención debida a su fundamental función de pautar el derecho. Eso también tiene efectos sistémicos, pues la incerti-dumbre jurídica promueve la litigación. El tribunal congestio-nado es, además, más propenso a combatir la congestión me-diante la reducción de la tasa de expedición de recursos discrecionales. Id.
Buscar la solución a ese problema no es imposible si lo enfrentamos con todas las medidas disponibles. Para hacer esa gesta, el Tribunal de Apelaciones es un buen ejemplo a seguir. Ese foro ha sido eficiente en su encomienda y no tiene problemas de demora judicial. Helfeld, supra, pág. *69 912. La muestra analizada en el estudio reflejó que el Tribunal de Apelaciones resolvía los certiorari en tres meses, las apelaciones y las revisiones administrativas en seis me-ses y los recursos extraordinarios en dos meses. Id., pág. 899. Iguales resultados ha logrado obtener el Tribunal de Apelaciones federal para el Primer Circuito. íd., pág. 900.
No obstante, nuestra realidad es muy diferente. A ma-nera de ejemplo, el estudio dirigido por el profesor Helfeld consideró el trámite seguido en 117 casos resueltos por este Tribunal. Un total de 95 casos (o el 81%) tardaron más de un año en resolverse y de éstos, 37 (o el 32%) tardaron más de dos años. Helfeld, supra, pág. 903. Según esa muestra, cuando este foro considera los méritos de una controversia, uno de cada tres casos tardará más de dos años en resolverse. Nos parece injusto ese patrón. Incluso, ese in-tervalo de tiempo es más devastador que el que nos im-pulsó a solicitar el aumento a nueve Jueces en 1961. “En el período comprendido entre abril de 1956 y marzo de 1957, más de un 27% de las opiniones se emitieron después de haber transcurrido más de un año desde la sumisión del caso ....” Comité para el Estudio y la Evaluación del Sis-tema Judicial, supra, pág. 2. Esa cifra es considerable-mente inferior al 81% que refleja el estudio antes reseñado sobre nuestra situación actual.
A esa lamentable realidad le tenemos que sumar que este Foro tarda seis meses y medio en tan sólo decidir si expide onoun auto, mucho más que los cuatro a cinco meses que mencionó nuestro Juez Presidente en el 2008. Hernández Denton, supra, pág. 927. Este atraso antecede el funcionamiento con menos de siete Jueces durante los términos judiciales del 2005 al 2009. Ésta es una estadís-tica inaceptable. En el mismo lapso de tiempo o menos, el Tribunal de Apelaciones resuelve un caso en sus méritos. Si bien es cierto que a diferencia del foro intermedio, este Tribunal tiene la función constitucional de sentar prece-dentes y pautar así el Derecho, esa diferencia no justifica *70 una demora tan grande en la solución de recursos. Mucho menos explica la demora de más de seis meses para emitir un “no ha lugar” a la expedición de un auto discrecional, asunto que no requiere pautar el derecho.
Tenemos que ser conscientes de que esa demora judicial tiene un impacto injusto en la vida de los seres humanos adversamente afectados. Helfeld, supra, pág. 903. Para unos la rapidez con que resolvamos puede ser la diferencia entre la solvencia o la ruina económica. Para otros puede ser la diferencia entre la libertad o la reclusión injusta.
La cifra de casos pendientes disminuirá en la medida en que reduzcamos el tiempo que toma decidir si se expide un auto. Evidentemente, si el Tribunal Supremo opera con más Jueces estará en posición de atender un mayor nú-mero de recursos por reunión en pleno o salas. Véanse las expresiones de la Leda. Patricia Otón, ex Secretaria del Tribunal Supremo, en Herrero Acevedo, supra, pág. 1061.
Actualmente, cada uno de los siete Jueces presenta cinco casos al Pleno, para un total de 35 recursos semanales. Con un funcionamiento de tres salas com-puesta por tres Jueces cada una, sin más, estaríamos en posición de atender 45 recursos semanales entre las tres salas. Además, la calidad en la revisión aumentará, ya que cada Juez tendrá que examinar un total de 15 recursos en vez de 35. Esto se debe a que cada sala atendería 15 recur-sos semanales en vez de los 35 que atiende actualmente el Pleno. A corto plazo, ya que la carga semanal de cada Juez se reducirá considerablemente, sería posible aumentar temporeramente la asignación de casos de cinco a siete por Juez, lo que aumentaría la producción semanal de 35 a 63 recursos. Al tomar esa medida, cada sala atenderá 21 re-cursos semanales. Esto es, con esa medida temporera esta-ríamos duplicando la producción semanal de este Tribunal. Eso nos permitiría eliminar en un plazo breve el atraso existente en la consideración de recursos, para expedir o denegar el auto.
*71 La medida que hoy tomamos nos permite también estu-diar con detenimiento los recursos y realza la imagen del Tribunal, ya que desarticula la crítica injustificada por lo que algunos consideran una dependencia excesiva en los memorandos que preparan los abogados del Panel Central de este Tribunal. Véase García Padilla y Alvarez González, supra, págs. 201-203.
El problema de la demora en este Tribunal se agrava si consideramos que la espera en muchos casos no termina la controversia entre las partes, pues el asunto se refiere a otro foro. Ese obstáculo de la justicia debe atenderse con sensibilidad y responsabilidad. Una persona que acude al foro judicial a reclamar sus derechos merece justicia opor-tuna, no a destiempo. Debemos emplear todos los recursos que estén a nuestro alcance para garantizar úna justicia pronta. Asumir la posición contraria sería servirse de cri-terios ajenos a la función judicial para no hacer lo correcto. Este Tribunal no está dispuesto a permitir tal afrenta a la justicia.
La solución no se limita al aumento de jueces, sino que tiene que venir acompañada de la utilización de todos los recursos viables. Por ejemplo, ya adoptamos las nuevas Re-glas de Evidencia y de Procedimiento Civil. Actualmente, las propuestas Reglas de Procedimiento Penal se encuen-tran bajo revisión. Por otro lado, debemos revisar deteni-damente nuestro Reglamento para fomentar una resolu-ción efectiva de los asuntos ante nuestra consideración. Todos estos mecanismos deben emplearse paralelamente para asegurar a los ciudadanos un foro en el que puedan reclamar sus derechos de forma eficiente.
El aumento de jueces para atajar la demora judicial ha sido parte de nuestra cultura judicial y ha dado resultados en el pasado. Ahora no debe ser la excepción. La Constitu-ción provee este método para que a petición del Tribunal Supremo se ajuste su composición según las necesidades lo requieran. Ante un problema de demora judicial y de inefi- *72 ciencia en el manejo de los casos, esta solicitud no debe ser la única acción y debemos fortalecer esta medida con otras.
No se trata de añadir dos jueces a este Tribunal para que siga funcionando igual. De nada sirve aferrarnos a la ineficacia. Debemos replantearnos la manera en que este Foro funciona y atiende los casos que los ciudadanos nos presentan. Por ejemplo, la práctica generalizada es que luego de acoger un recurso, este Tribunal lo resuelve a base del expediente y sin contar con el beneficio de una vista oral. En cambio, en la inmensa mayoría de las jurisdiccio-nes de Estados Unidos, las vistas orales son parte integral de su funcionamiento. Ello permite al tribunal aclarar y delimitar las alegaciones de las partes. Además, permite a los jueces puntualizar sus posiciones luego de un estudio detallado del expediente antes de que se asigne el caso al juez o jueza ponente. Más aún, la discusión del caso luego de la vista oral permite que el recurso se asigne al juez que puede lograr un consenso entre los posibles fundamentos para decidir, lo que evita el fraccionamiento del tribunal por la proliferación de opiniones producto de la falta de consenso. Eso realza los beneficios importantes de la cole-giación, contribuye a la eficiencia del tribunal y propende a que éste paute el derecho de una forma clara y precisa.
La falta de vistas orales en este Tribunal y de una re-unión plenaria luego de cada vista, para votar y asignar el caso para la redacción de la ponencia mayoritaria, ha sido objeto de crítica bien fundamentada. Véanse: García Padilla y Álvarez González, supra, págs. 197 — 198; Herrero Acevedo, supra, págs. 1071-1072. Lo cierto es que la celebra-ción de más vistas orales y la discusión posterior de cada caso por el Tribunal en pleno, es parte importante de un funcionamiento transparente y accesible al Pueblo desde un foro verdaderamente colegiado.
En primer lugar, ello obliga a los jueces a hacer su estudio independiente del caso y de los alegatos de las partes antes de *73 que circule entre ellos un borrador de opinión. De esta forma cada juez se encuentra en mejor posición para evaluar las bon-dades y defectos del borrador de opinión que eventualmente se prepare, para sugerir modificaciones o para producir una opi-nión separada con mayor celeridad.
Segundo, y no menos importante, el método propuesto reduce el potencial de fricciones entre un grupo de personas que vienen llamadas a convivir por un largo número de años. Desde la perspectiva humana, simplemente es más sencillo y genera menos tensión interpersonal asumir una postura en un caso antes de que otro juez haya hecho un estudio más pro-fundo y haya redactado un proyecto de opinión. García Padilla y Alvarez González, supra, pág. 197 esc. 28.
Como señaló hace décadas el Comité para el Estudio y Evaluación del Sistema Judicial, supra, pág. 17:
La experiencia del Tribunal Supremo de los Estados Unidos y de varios otros tribunales demuestra cuán preferible es que cada caso sea objeto de estudio y discusión por cada juez y de que la asignación de la tarea de escribir la opinión del Tribunal se haga por el Juez Presidente, o de estar el Juez Presi-dente en minoría en determinado caso, por el juez de mayor antigüedad dentro de la mayoría, después de que cada juez se haya expresado y votado sobre el caso.(5) Es así que un tribunal de última instancia puede alcanzar mejor la categoría de tribunal colegiado y conjurar las deficiencias de las opiniones representativas no del Tribunal sino del criterio de un solo juez.
Empero, un Tribunal de siete Jueces no puede atender la carga actual de recursos y celebrar vistas orales con fre-cuencia, por el tiempo de preparación y análisis del expe-diente que cada vista y la discusión subsiguiente en Pleno conllevarían para cada uno de los Jueces de este Foro. No hay tiempo para eso con la tarea semanal de casos nuevos para estudio e informe. Por eso es necesario reducir la *74 carga individual de casos por Juez, lo que sólo puede ha-cerse aumentando la composición del Tribunal.
Un tribunal de última instancia puede operar eficiente-mente con nueve Jueces. Así lo revela nuestra propia his-toria y la experiencia de nuestras contrapartes estatales. Además del Tribunal Supremo de Estados Unidos, los es-tados de Alabama, Mississippi, Oklahoma, Texas y Washington operan su tribunal de última instancia con nueve jueces. La mayoría de estos estados tienen una población similar a Puerto Rico (Alabama con 4.7 millones, Mississippi con 2.9 millones, Oklahoma con 3.6 millones y Washington con 6.6 millones de habitantes). Véase www.census.gov. De hecho, el aumento en el número de jueces para atender los problemas particulares de una ju-risdicción no es ajeno a la realidad contemporánea. El es-tado de Georgia, que tiene una población de 4.5 millones, actualmente considera aumentar de siete a nueve el nú-mero de Jueces de su Tribunal Supremo. Al presente, esa medida es evaluada por la Asamblea Legislativa de Georgia. Ga. Senate Bill 429, 10 LC 28 5088.
Recordemos que en 1960 se enmendó el Art. V, Sec. 4, de la Constitución de Puerto Rico para permitir el funciona-miento en salas de este Tribunal. Esta disposición fue de-batida por la Convención Constituyente aunque no fue in-cluida originalmente en la Constitución. Informe de la Comisión de lo Jurídico de la Cámara de Representantes de 2 de junio de 1960, supra, pág. 4. En los debates de la Convención Constituyente, el delegado, Sr. Miguel A. Gar-cía Méndez, expuso la posición del Juez Presidente del Tribunal Supremo. Luego de dar por sentado que el Tribunal Supremo debía ser aumentado a siete Jueces, el Juez Pre-sidente afirmó que necesitaba la “autorización para divi-dirse en secciones de tres jueces, según lo determine su propia reglamentación”. Diario de Sesiones, supra, pág. 527.
*75 Posteriormente, " [1] a condición cada vez más crítica de los calendarios llevó a la consideración y aprobación en el referéndum especial del 8 de noviembre de 1960 de una enmienda a la sección 4 del artículo V de la Constitu-ción” y en “su recomendación favorable a tal enmienda, el Tribunal Supremo solicitó el aumento a nueve del número de sus jueces”. Comité para el Estudio y la Evaluación del Sistema Judicial, supra, págs. 3-4.
Para entonces, podían operar divididos en salas los Tribunales Supremos de España, Francia, Bolivia, Colombia, Costa Rica, Cuba, México y El Salvador. Informe de la Co-misión de lo Jurídico de la Cámara de Representantes de 2 de junio de 1960, supra, pág. 4. Además, esa práctica era permitida en los Tribunales Supremos de los estados de Louisiana, Nebraska, Mississippi, Minnesota, Tennessee y Washington. Id. Esta enmienda se hizo con la previsión de que la composición de Jueces en el Tribunal Supremo se iba a aumentar a nueve. Véanse expresiones de los Ledos. José Trías Monge, Francisco Ponsa Feliú, Raimundo Gar-cía Cintrón, Gabriel de la Haba y Luis Blanco Lugo en la vista pública para considerar la enmienda constitucional, Vista Pública para considerar la R. Cone, del S. 32 para proponer una enmienda a la See. 4 del Art. V de la Consti-tución, 20 de mayo de 1960, págs. 8, 14, 21, 26 y 38. Esta medida y el aumento a nueve Jueces “facilitaría aún más el trabajo del tribunal”. Id., pág. 3 (Ponencia del Hon. Hiram Cancio).
La eficiencia y productividad de los tribunales de última instancia que tienen nueve jueces y que funcionan en sa-las, ha sido comprobada de forma empírica. Un estudio de este mismo año concluye que existe una relación directa entre el número de jueces que componen un tribunal de última instancia, su funcionamiento en paneles y la pro-ducción de casos. Según el estudio empírico, un tribunal de cinco jueces emite alrededor de 167.5 decisiones al año; uno de siete jueces emite aproximadamente 183.9 decisio-nes anualmente, y uno de nueve jueces emite un promedio *76 de 269.5 decisiones al año. V.E. Flango, State Supreme Court Opinions as Law Development, 11 J App. Prac. & Process 105, 116 (2010). Según este artículo, lo que hace que el promedio de decisiones emitidas por los tribunales compuestos por nueve jueces sea más alto es su funciona-miento en paneles. Destaca la productividad del Tribunal Supremo de Mississippi y el de Alabama, que operan en salas o secciones de cinco y tres jueces, respectivamente.
“El funcionamiento del Tribunal en salas, en unión a las otras reformas efectuadas a partir del 1958 [como la com-posición de nueve jueces], permitió finalmente la descon-gestión del calendario.” Comité para el Estudio y la Eva-luación del Sistema Judicial, supra, pág. 4. Eso es un hecho verifiable que no puede ser borrado de nuestra his-toria por otras consideraciones ajenas a la consecución del bienestar de nuestro sistema judicial.
La enmienda constitucional de 1960 nos brinda otra he-rramienta para atender el problema de la demora judicial. Como tal, debe ser empleada para atajar el problema que hoy nos ocupa. Como señaló la Escuela de Administración Pública de la Universidad de Puerto Rico en su informe a la Asamblea Constituyente, el trabajo de este Tribunal
... es tan complejo que la capacidad para trabajar en secciones ayudaría a acelerar el despacho de los asuntos; y al mismo tiempo a disminuir notablemente la posibilidad de que se dic-ten decisiones por un solo juez. Una corte sobrecargada tiende a delegar la redacción de opiniones en un solo miembro, y los otros, por lo tanto, concurren pasivamente, a menos que haya una profunda diferencia de criterio. Escuela de Administra-ción Pública de la Universidad de Puerto Rico, La nueva cons-titución de Puerto Rico: informes a la Convención Constitu-yente, San Juan, Ediciones de la U.P.R., 1954, pág. 467.
Nos compete a nosotros determinar “cuántas salas de-berán crearse, cuántos jueces han de constituir una sala del Tribunal [y su funcionamiento interno], y el número de ellos que han de concurrir en la decisión mayoritaria de *77 una sala, para que dicha decisión constituya la decisión del Tribunal”. Informe de la Comisión de lo Jurídico de la Cá-mara de Representantes de 2 de junio de 1960, supra, pág. 5. Este proceso conllevará una revisión profunda de nues-tro Reglamento.
Somos conscientes de que todas las medidas que adop-temos tienen que emplearse adecuadamente para que sir-van a los propósitos genuinos que las inspiran. En la en-mienda constitucional de 1960 “se autoriza a este Tribunal a funcionar flexiblemente, en pleno o divido en salas com-puestas por no menos de tres (3) jueces”. Sánchez Rodríguez v. López Jiménez, 116 D.P.R. 392, 397 (1985) (en reconsideración). Esto “[s]e concibe, desde todo punto prag-mático, y supera la limitación inherente que representaría para la administración de la justicia la imposición al Tribunal de restricciones absolutas”. Id.
Sin duda, la utilización errónea del funcionamiento en salas fue un problema en el pasado. El Juez Asociado Se-ñor Negrón García ha expresado que ese sistema es “una espada de doble filo. Aunque indudablemente ayuda a agi-lizar el proceso decisorio, lo hace a costas de la uniformi-dad del Derecho”. Negrón García, supra, pág. 10. Ahora bien, precisamente ese raciocinio se debatió en la Asam-blea Constituyente y fue derrotado en las vistas para la enmienda constitucional del 1960. Véase Vista Pública para considerar la R. Cone, del S. 32, supra. De todos mo-dos, esa preocupación puede ser atendida por este Tribunal por medio de reglamentación. A manera de ejemplo, las reglas del Tribunal Supremo de Tennessee proveen para que algunos casos sean atendidos por salas especiales. Las decisiones de estas salas no son publicadas ni son vincu-lantes, salvo que la mayoría de los Jueces del Tribunal Supremo lo ordene. Tenn. Sup. Ct. Rule 4.
Para evitar repetir los errores del pasado, debemos evi-tar que las decisiones de una sala de este Tribunal sienten precedente. El error en la década de los 60 fue ese y no la *78 división del Tribunal en tres salas de tres Jueces.(6) Nues-tro Reglamento deberá prescribir las normas que aseguren la uniformidad de nuestras decisiones.
Somos conscientes de que esta medida tendrá un im-pacto económico en las arcas de la Rama Judicial. Sin embargo, ese gasto es ínfimo en comparación con los benefi-cios que obtendrán las partes que acudan ante nos. Confiamos que las otras Ramas del Gobierno nos asigna-rán los fondos necesarios para implantar la solicitud que hoy hacemos. Ahora bien, al igual que lo ha hecho el resto del Gobierno, compete a la Rama Judicial ajustar su pre-supuesto para garantizar que los recursos se utilicen de la manera más eficiente posible. Es nuestro deber indelega-ble dirigir fructíferamente nuestros recursos. Así será.
Tampoco podemos olvidar el impacto que tiene la pre-sencia de dos Jueces adicionales en este Tribunal. “La ra-zón histórica de la composición de este Tribunal respondió a una preocupación de la Asamblea Constituyente por ga-rantizar una multiplicidad de criterios, enfoques y visio-nes, que hicieran de la instancia apelativa una alternativa amplia y justa en sus decisiones”. Sánchez Rodríguez v. López Jiménez, supra, pág. 394. Cada integrante de este Foro aporta su visión particular a las controversias que llegan ante nos. Esas visiones diversas enriquecen el desa-rrollo del Derecho y contribuyen a asegurar que este Foro considere todas las consecuencias de nuestras decisiones, en ánimo de impartir justicia.
En 1994 nuestro Pueblo fue consultado para auscultar *79 si quería eliminar de la Constitución la cláusula que nos faculta a solicitar a la Asamblea Legislativa la variación del número de Jueces de este Tribunal. Los electores vota-ron para retener ese mecanismo constitucional,(7) diseñado para reducir o ampliar el número de Jueces del Tribunal Supremo cuando las circunstancias así lo aconsejen. Así pues, en vez de fijar en nueve el número de miembros de este Tribunal como se pretendía con la enmienda constitu-cional propuesta, los electores prefirieron que fuéramos no-sotros quienes le manifestáramos a la Asamblea Legisla-tiva cuál entendemos que es el número de Jueces que se necesita para realizar nuestra función judicial.
“Los factores históricos tienen importancia, pero las con-sideraciones básicas deberán ser en términos de la natura-leza, complejidad y cantidad de la tarea.” Escuela de Admi-nistración Pública, op. cit., pág. 466. Nuestro calendario actual y la necesidad de un funcionamiento más transpa-rente y accesible al Pueblo aconsejan que utilicemos ahora ese mecanismo constitucional. Así lo hicimos cuando nues-tra sociedad era menos litigiosa, con una población de poco más de la mitad de la actual. Aspiramos a un Tribunal re-novado, capaz de enfrentar los retos del siglo XXI.
Esas son nuestras únicas motivaciones. Algunas perso-nas han preferido imputarle a este Tribunal otros propósi-tos ajenos a la sana administración de la justicia y al bien-estar de todo nuestro Pueblo. Los que lanzan esos ataques olvidan que también habrá quien le adjudique el mismo propósito inadecuado a la oposición a esta medida. Por eso, esas imputaciones desafortunadas e injustificadas no me-recen comentarios adicionales. Nuestra función es dirigir-nos a nuestro Pueblo directamente y por escrito, como lo hacemos hoy; no mediante rumores, especulaciones o ata-ques personales. Nos adherimos estrictamente al mandato *80 de estricta “confidencialidad de la información obtenida en el ejercicio de ... [nuestras] funciones judiciales”. Canon 18 de Ética Judicial, 4 L.P.R.A. Ap. IV-B. Protegemos así la candidez, amplitud y apertura de nuestras deliberaciones como foro colegiado, y mantenemos nuestra independencia judicial al impedir que se ejerzan presiones externas aje-nas a nuestra función.
La imagen de este Tribunal no se lacera cuando funda-mentamos y ejercemos la facultad que la Constitución nos confiere para solicitar un aumento en el número de nues-tros integrantes. Lo que sin duda nos hace daño como ins-titución es el comentario ajeno a “la debida propiedad y circunspección” judicial (4 L.P.R.A. Ap. IV-B, C. 14), y la filtración selectiva de nuestras comunicaciones internas como sustituto de la ponderación sosegada y en herman-dad entre Juezas y Jueces. Nuestro interés en deliberar y discutir el contenido de esta Resolución se frustró cuando en lugar de este recinto judicial se escogió la arena política como foro. En respeto a la independencia judicial, rechaza-mos cualquier intento de ejercer presiones externas al ejer-cicio colegiado de deliberación que siempre hemos defen-dido y promovido con el mayor celo. Es eso y no esta Resolución lo que compromete la independencia judicial.
Por los fundamentos expuestos, se solicita a la Asamblea Legislativa que aumente mediante ley la composición del Tribunal Supremo de siete a nueve Jueces y asigne los fondos necesarios para ello durante el año fiscal en curso. Se ordena la publicación inmediata de esta Resolución. Notifíquese de inmediato, por fax, teléfono y mediante notificación personal diligenciada hoy mismo por un alguacil de este Tribunal, a los Secretarios de ambas cámaras legislativas.
Lo acordó el Tribunal y certifica la Secretaria del Tribunal Supremo. La Juez Asociada Señora Rodríguez Rodrí-guez emitió una opinión disidente. El Juez Presidente Se-ñor Hernández Denton y la Jueza Asociada Señora Fiol Matta emitieron sendos votos disidentes.
*81 [[Image here]]
S2 ¡z¡ O ^ M e ¶ O
a a p a ja cr p" E, «- e 3 p P> M. o o> p s»p <§-cg p

 De hecho, la Escuela de Administración Pública de la Universidad de Puerto Rico hizo pública su oposición al mecanismo que se establece en el Art. V, Sec. 3 de nuestra Constitución. Escuela de Administración Pública de la Universidad de Puerto Rico, La nueva Constitución de Puerto Rico: informes a la Convención Cons-tituyente, San Juan, Ediciones de la U.P.R., 1954, págs. 465-466. No obstante, la Asamblea Constituyente descartó su análisis e incluyó el texto del Art. V, Sec. 3, a petición nuestra.

 A lo anterior debemos añadir que la Ley Núm. 161 del 1 de diciembre de 2009, según enmendada, conocida como Ley para la Reforma del Proceso de Permi-sos de Puerto Rico, 23 L.P.R.A. see. 9011, establece que este Tribunal podrá revisar directamente las determinaciones finales que emita la Junta Revisora de Permisos y Uso de Terrenos. Es decir, las partes no tendrán que recurrir al Tribunal de Apela-ciones (foro judicial que típicamente revisa las determinaciones finales de las agen-cias administrativas), sino que podrán acudir directamente ante nos para solicitar la revisión de las resoluciones que emita la Junta Revisora. Este mecanismo es parte del nuevo enfoque de la ley que busca que el sistema de permisos en Puerto Rico sea uno ágil y eficiente. Véase Exposición de Motivos de la Ley Núm. 161. Es muy probable que con su implantación se presenten más recursos ante este Tribunal. Ello aconseja que tomemos todas las medidas que sean necesarias de cara a esa eventualidad.

 Como bien lo ilustra el ex Juez Asociado Señor Negrón García:
“Los recursos presentados, de carácter discrecional, pasan a un Panel Central compuesto por un grupo de abogados que evalúa inicialmente tanto el aspecto juris-diccional como los méritos. El director del Panel asigna los casos a los abogados, quienes estudian los recursos asignados y los respectivos memorandos, apéndices y demás anejos ... Esos informes o memorandos son remitidos a los jueces, de manera que ellos cuenten con el beneficio de una evaluación inicial de los casos que serán discutidos oportunamente en sesión del Pleno.
*65 “Luego el recurso es personal y directamente informado en la conferencia ple-naria por el juez a quien le fue asignado. Como ponente, éste formula una recomen-dación inicial, que puede ser que se deniegue el recurso, se expida, se emita una orden de mostrar causa, o se adopte cualquier otro curso de acción o trámite. En dicha etapa todos los jueces exponen —breve o extensamente— sus respectivos pun-tos de vista y criterios jurídicos sobre los méritos o frivolidad del recurso. En orden a esa discusión, o en aquellos casos dudosos si es necesario, se autoriza una Exposición Narrativa de la Prueba o la Transcripción de Evidencia. También se solicitan los autos originales, y cuando es menester, se ordena que se eleve la prueba documental. Si algún magistrado desea estudiar el recurso más a fondo, se pospone su conside-ración para otra conferencia del Pleno. La divergencia de un solo magistrado es suficiente para abrir más amplia y detalladamente la discusión. Cada magistrado expone su posición, y finalmente, por votación mayoritaria se adopta el acuerdo.” A. Negrón García, Práctica apelativa: aspectos constitucionales, legales y reglamenta-rios, 42 Rev. Jur. U.I.P.R. 1, 18-19 (2007).

 Estos promedios utilizan las estadísticas desde el 2002-2006. En ese período, este Tribunal operó con siete Jueces.

 Con ese propósito, el 9 de marzo de 2010 enmendamos la Regla 5(a) de nuestro Reglamento, 4 L.P.R.A. Ap. XXI-A. Véase In re Enmda. R. 5 Reglamento T.S., 178 D.P.R. 461 (2010).

 “La discusión y planteamientos de distintos delegados [a la Asamblea Constituyente] indica un sentir respecto a lo aconsejable que resultaría que las de-cisiones emitidas por salas compuestas por sólo tres (3) jueces, fuesen emitidas por unanimidad.” Sánchez Rodríguez v. López Jiménez, 116 D.P.R. 392, 394 (1985). Para garantizar la amplitud de la revisión judicial, podría establecerse que cuando no haya unanimidad de criterio en una sala, el recurso pase al Tribunal en pleno. Tam-bién podría enmendarse la Regla 4(b) de nuestro Reglamento, 4 L.P.R.A. Ap. XXI-A, para establecer que cuando este Tribunal se divida en salas, cada moción de recon-sideración sea atendida por una sala distinta a las que intervinieron anteriormente en el recurso. Eso garantizaría que todos los integrantes del Tribunal intervengan eventualmente en la consideración de un recurso, cuando las partes agoten el meca-nismo reglamentario de la reconsideración.

 La votación en la elección efectuada el 6 de noviembre de 1994 fue de 718, 272 (54%) en contra y 595, 425 (44.8%) a favor de la enmienda constitucional. Véase http://www.ceepur.org/referenduml994/escrutinio/datos/.